**FAZZIO LAW OFFICES**
John P. Fazzio, Esq. (JF1752)
305 Broadway, 7th Flr, Ste. 19
New York, NY 10007
Tel: (201) 529-8024
Fax: (201) 529-8011

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RAHUL MANCHANDA,<br><br>            Plaintiff,<br><br>      v.<br><br>UNITED STATES GOVERNMENT, INTERNAL REVENUE SERVICE ("IRS"),<br><br>            Defendants. | **AMENDED COMPLAINT**<br><br>No. 21 Civ. 10745 (ALC) |

Plaintiff Rahul Manchanda, by its attorney, John P. Fazzio, Esq., Fazzio Law Offices, LLC, alleges as follows:

**Jurisdiction and Venue**

1. This Court has subject-matter jurisdiction over this action because it presents a federal question under 28 U.S.C. § 1331 and the Defendant is a U.S. Government agency susceptible to suit under 28 U.S.C. § 1391(e).

2. Venue is proper in this district because Plaintiff and Defendants are located, reside, and/or do business in the district, and/or a substantial part of the events or omissions giving rise to the claims occurred in the district. 28 U.S.C. §§ 1391(b), 1391(e).

**The Parties**

3. Plaintiff is an individual subject to tax collection activity from the Internal Revenue Service ("IRS"). At all times relevant hereto, Plaintiff Rahul Manchanda had (and has) a business office located at 30 Wall Street, 8th Floor, New York, NY 10005 where he is an attorney specializing

in immigration law, and has a home address of 1 Columbus Place, New York, NY 10019.

4. Defendant Internal Revenue Service ("IRS") "is a bureau of the Department of the Treasury under the immediate direction of the Commissioner of Internal Revenue." 26 C.F.R. § 601.101(a); see also 26 U.S.C. § 7803. The IRS is responsible for the implementation and enforcement of the internal revenue laws. See 26 U.S.C. § 7803. The IRS qualifies as an "agency" as that term is defined by 5 U.S.C. § 701(b)(1).

5. The Court has personal jurisdiction over all Defendants.

### Facts Common to All Counts:
### The Defendants' Unauthorized and Abusive Tax Collection Activities

6. Like most taxpayers, the Plaintiff files an annual U.S. Individual Income Tax Return, Form 1040. In 2008, the Plaintiff experienced financial hardship stemming from the Global Financial Crisis of 2007-2008 ("GFC" or "Great Recession") and was unable to pay all income taxes that came due between approximately 2008-2014.

7. After the Great Recession, Plaintiff's business dried up and he had to lay off his entire staff of 20 employees and operate as a solo practitioner for a period of time. The recession exacerbated Plaintiff's IRS problem and made it impossible for Plaintiff to pay down the debts he had accrued with the IRS in prior years while simultaneously paying for reasonable basic living expenses. The IRS defines this situation as a "hardship."

8. IRM § 5.16.1.2.9(1) (09-18-2018), Hardship states, "[a] hardship exists if a taxpayer is unable to pay reasonable basic living expenses… [g]enerally, these cases involve no income or assets, no equity in assets *or insufficient income to make any payment without causing hardship.*" (Emphasis added). The IRM further explains that "**Caution:** If a hardship determination is verified, *a levy cannot be issued* or left in place to persuade a taxpayer to file." IRM § 5.16.1.2.9(12). In short, the IRS's own regulations and their operations manual recognize that taxpayer's such as the Plaintiff who cannot currently pay down liabilities should not be subject to levy or enforced collection that is

2

merely punitive, and which will not result in the collection of the relevant taxes.

9. Financial problems and divorce often go hand-in-hand. Financial problems are one of the leading causes of divorce. Conversely, more often than not, when a household splits into two households, both parties are worse off financially due to the division of resources. Plaintiff's financial hardship was *further* exacerbated by the contested divorce, hard fought child custody battles in the New York Family Courts that resulted, and the stress and distraction that a protracted emotional litigation battle brings about. The IRS recognizes the financial fallout and reduction in income that flows from divorce proceedings. IRM § 5.15.1.2(12) (07-24-2019), dealing with "economic hardship" notes as an example that a verbal explanation that a drop in income resulted from a divorce, and going from a two-income to a one-income household is permissible for IRS Agent's to rely on when investigating a taxpayer's collection potential and ability to pay: "**Example:** *Taxpayer's income dropped significantly from the prior year and taxpayer explains that he went through a divorce and is no longer claiming two incomes. Verbal substantiation supporting the drop in income should be documented in the case history.*"

10. A series of bankruptcy filings became unavoidable. Plaintiff's financial situation had steadily worsened with the downturn of Plaintiff's business during the Great Recession and as a result of his ensuing divorce. On October 4, 2011, Plaintiff filed for Chapter 7 Bankruptcy under Bankruptcy Petition No.: 11-14666-SMB, which was eventually dismissed. On September 3, 2012, Plaintiff re-filed for Chapter 7 Bankruptcy under Bankruptcy Petition No.: 13-12880-MG, listing the IRS as a creditor who was owed hundreds of thousands of dollars. Plaintiff's debts were ultimately discharged on Jan. 13, 2014.[1] Thus, the re-filed bankruptcy was pending between Sep. 2012 and Jan.

---

[1] The IRS debts remained of record after discharge. It is unclear at this juncture what the reason is, but whether because the applicable statute of limitations for dischargeability of tax debts under 11 U.S.C. §§ 523(a)(1)(B); 523(a) and 507(a)(8)(A)(i)-(ii) had not yet run, whether through inadvertence, or because of IRS error or administrative oversight (including any negligent or reckless violation of the Bankruptcy laws, separately actionable in Bankruptcy Court), the IRS debts remained of record.

2014, during which time the automatic stay prevented any collection action by IRS against Plaintiff.

11. *While the bankruptcy proceedings were ongoing, in violation of the automatic stay (11 U.S.C. § 362)*, **the IRS took unauthorized collection action and reduced the Plaintiff's tax debts to Federal Tax Liens.** For example, a Notice of Tax Lien bearing Federal Lien Number 957181813 was filed with the New York County Register's Office on August 22, 2013 in the amount of $98,274.96 despite the automatic stay which was in place due to the pendency of the bankruptcy proceeding. The automatic stay under 11 U.S.C. § 362 clearly prohibits the filing a Notice of Federal Tax Lien while the automatic stay is in place and IRS regulations expressly recognize this.

12. Internal Revenue Manual ("IRM"), Section 5.17.8.10 (04-13-2020), Automatic Stay - 11 USC § 362, states pertinently: "(1) Under 11 USC § 362(a), an automatic stay arises by operation of law as soon as the bankruptcy petition, whether voluntary or involuntary, is filed. The stay prohibits most collection activity. Specifically, it prohibits: *** (d) Any act to create, perfect, or enforce a lien against property of the estate; (e) Any act to create, perfect, or enforce a lien against the debtor's property securing a pre-petition debt; (f) Any act to collect, assess, or recover a pre-petition claim against the debtor; ***". Clearly, in violation of the automatic stay in bankruptcy, the IRS sought to perfect its lien rights against Plaintiff's assets, which is prohibited by IRM § 5.17.8.10(1)(e). The liens were placed for the collection of pre-petition 2010 and 2011 tax debts.

13. Plaintiff's financial situation improved between 2015-2018 and continues to be much better than it was during the previous period of time discussed above. Plaintiff, having dug out of a hole and now on better financial footing, but still suffering a financial hardship making it impossible to pay his IRS debts in full, with all of the penalties and interest that accrued, sought to resolve his tax liability with the United States Government and with the New York State Department of Taxation and Finance ("NYSDTF") by way of settlements, which are technically referred to as "Offers-in-Compromise."

4

14.     On or about September 5, 2018, Plaintiff filed Offers-in-Compromise with the IRS and with the NYSDTF.

15.     Tammy Lu of NYSDTF was able to confirm to Plaintiff's Accountant, Marc Albaum and to Mr. Manchanda directly, on September 11, 2018 that the Offer-in-Compromise was received via mail as of Friday, September 7, 2018.

16.     Despite Plaintiff and his Accountant, Marc Albaum each following up with the IRS by phone, calling the various Service Centers, waiting on hold for hours, and speaking to multiple different representatives who were unable to provide a definitive answer, neither the Plaintiff nor his Accountant was able to receive confirmation of filing receipt of Plaintiff's Offer-in-Compromise with the IRS.  Since a taxpayer is entitled to having all collection activity frozen (similar to the automatic stay) once an Offer-in-Compromise is filed, and since the Plaintiff was trying to settle his debts voluntarily without collection adverse action against him, he was concerned by the lack of a response.

17.     I.R.C. § 6331(k)(1)(A)-(B) provides that no levy may be made: (A) during the period that the offer is pending, and (B) for an additional 30 days after the offer is rejected, and during the time any appeal of the rejection is pending.  IRM § 8.23.1.2 (04-18-2016), **"Suspension of Levy While Offer is Pending"** provides additional detail.  Under Treasury Regulation 301.7122-1(d)(2) an offer becomes "pending" for § 6331(k) purposes once it is processed.  In the event the Offer-in-Compromise is rejected and is not processed, thus depriving the taxpayer of his "Suspension of Levy" and other collection stoppages, the IRS must promptly send a rejection notice to apprise the taxpayer of their status, consistent with the Taxpayer Bill of Rights.

18.     Over the weeks leading up to October 15, 2018, Plaintiff received a series of harassing calls to his home and office from IRS collection personnel and began receiving new collection notices (i.e., the CP504 Notice of Intent to Levy) threatening imminent collection activity, including liens and levies, if tax debts were not satisfied.  This was very alarming as Plaintiff believed

5

he had a pending Offer-in-Compromise filed and pending decision which was now over one-month old.

19. On January 19, 2019, Plaintiff filed a Form 95, Claim for Damage against the United States for Unauthorized and Abusive Tax Collection because of the collection actions described above which were continuing despite the filing of a valid Offer-in-Compromise.

20. In September of 2019, with the passage of an additional nine (9) months, and no response from IRS, Plaintiff re-filed his Offer-in-Compromise with IRS on September 5, 2019, as described in greater detail below.

21. Over the weeks leading up to September 13, 2019, Plaintiff received a series of harassing calls to his home and office from IRS collection personnel and began receiving notices regarding imminent collection activity, including liens and levies, if tax debts were not satisfied. This was very alarming as Plaintiff had just re-filed his Offer-in-Compromise and the abusive and harassing collection activity roughly coincided with Plaintiff's efforts to resolve his tax debts.

22. On September 13, 2019, Plaintiff received a letter from the Holtsville, NY Centralized Offer in Compromise Processing Center informing him that his Offer-in-Compromise was received and was being processed and that he would be contacted by January 11, 2020. January 11, 2020 came and went, and February, March, April and May all passed without contact from the IRS. Despite the passage of over eight (8) months.

23. "The failure of an agency to make a final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim." 28 U.S.C. § 2675(a).

24. On June 10, 2020, the taxpayer filed a Form 95, Claim for Damage against the United States for Unauthorized and Abusive Tax Collection occurring on September 13, 2019,

6

claiming $100,000,000 in damages, which was properly filed with the Area Director, Attn: Compliance Technical Support Manager and as per the instructions to the form, filing with the U.S. Department of the Treasurer Civil Rights Division, U.S. Treasury Inspector General for Tax Administration.

## Count I – Unauthorized and Abusive Collection Action Under 26 U.S.C. § 7433

25. Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1-24 above.

26. 28 U.S.C. § 7433 provides that an aggrieved taxpayer can recover damages from the IRS for recklessly or intentionally, or by reason of negligence, disregarding any provision of the Code, or any other applicable regulation. Section 7433 specifically addresses IRS misconduct in the collection of taxes as opposed to actions taken in connection with the determination or assessment of taxes. *Miller v. United States*, 66 F.3d 220, 222-223 (9th Cir. 1995); *Shaw v. United States*, 20 F.3d 182, 184 (5th Cir. 1994). Damages are available under I.R.C. § 7433 where the IRS engaged in improper collection procedures, and did so intentionally, recklessly, or negligently. *Shaw*, *supra*, 20 F.3d at 184; see *Shwarz v. United States*, 234 F.3d 428, 433-434 (9th Cir. 2000).

27. An aggrieved taxpayer must bring an I.R.C. § 7433 claim "within 2 years after the date the right of action accrues." I.R.C. § 7433(d)(3).

28. An aggrieved taxpayer may recover damages "in an amount equal to the lesser of $1,000,000 ($100,000, in the case of negligence) or the sum of—(1) actual, direct economic damages sustained by the plaintiff as a proximate result of the reckless or intentional or negligent actions of the officer or employee, and (2) the costs of the action."

29. "Abusive Tax Collection" under I.R.C. § 7433 is that which violates the Fair Tax Collection Practices Act ("FTCPA") and the Taxpayer Bill of Rights ("TBR"). Statutory references

7

to specific instances of "abusive tax collection" can be found in IRC §§ 6304, 6304(b) titled "prohibition of harassment and abuse" and IRC § 7602(e)(1)-(2) (i.e. IRS is responsible to notify the taxpayer in writing of its intention to contact third parties before doing so). "Abusive Tax Collection" under IRC §§ 6304(b) is also defined to expressly include: (1) threats of violence; (2) the use of profane language; (3) repeated phone calls to annoy the taxpayer; [and] (4) the placement of telephone calls without disclosing the caller's identity.

30. I.R.C. § 7433(d)(1) provides that a judgment for damages "shall not be awarded . . . unless the court determines that the plaintiff has exhausted the administrative remedies available to such plaintiff within the Internal Revenue Service." See Treas. Reg. § 301.7433-1(e).

31. The exhaustion requirement under § 7433 is governed by Treas. Reg. § 301.7433-1. The taxpayer must submit a properly addressed administrative claim (to the "Area Director, Attn: Compliance Technical Support Manager"), including copies of substantiating documentation, identifying the grounds for relief "in reasonable detail," the injuries incurred, and the dollar value of the claim. Treas. Reg. § 301.7433-1(e)(2)(ii); see *Hallinan v. United States*, 498 F. Supp. 2d 315, 317-18 (D. D.C. 2007).

32. In the last two years, between December 20, 2018 and the filing of this action on December 20, 2020, there have been a number of instances where IRS agents have recklessly engaged in "Abusive Tax Collection" by making collection calls to Plaintiff at his home and place of business, harassing Plaintiff's staff by disclosing information about his tax debts in an unauthorized manner, and undertaking other collection activity while a pending Offer-in-Compromise was under consideration.

33. On January 19, 2019, the taxpayer filed a Form 95, Claim for Damage against the United States for Unauthorized and Abusive Tax Collection occurring on October 15, 2018, claiming $100,000,000 in damages, which was properly filed with the Area Director, Attn: Compliance

8

Technical Support Manager and as per the instructions to the form, filing with the U.S. Department of the Treasurer Civil Rights Division, U.S. Treasury Inspector General for Tax Administration.

34. On June 10, 2020, the taxpayer filed a Form 95, Claim for Damage against the United States for Unauthorized and Abusive Tax Collection occurring on September 13, 2019, claiming $100,000,000 in damages, which was properly filed with the Area Director, Attn: Compliance Technical Support Manager and as per the instructions to the form, filing with the U.S. Department of the Treasurer Civil Rights Division, U.S. Treasury Inspector General for Tax Administration.

35. The September 13, 2019 incident involved a number of contacts from IRS personnel to collect outstanding taxes in the weeks leading up to this date and culminated with a letter of September 13, 2019 being received from the Centralized OIC Unit in Holtsville, NY which informed the Plaintiff that an Offer-in-Compromise had been received for review on September 13, 2019 and that "You will be contacted by 01/11/20."

36. This was troubling as a prior Offer-in-Compromise was supposedly already under review since the previous October and no decision had been made.  Upon receiving the September 13, 2019 notice, Plaintiff called each of the COIC Unit in Holtsville, NY and the Kansas City, MO Service Center and the Philadelphia, PA Service Center to inform the IRS that collection activity was continuing after the submission of Plaintiff's Offer-in-Compromise, without action or confirmation, several times, and even after the September 13, 2019 confirmation letter, Plaintiff was still unable to get various IRS agents including Patton, Fusci, Williams-Wallace and others to confirm one way or another whether the Offer-in-Compromise was currently under review or not and whether Plaintiff should be concerned about collection activity (i.e., an imminent levy on his personal or business bank accounts, garnishment of wages, or lien filing).

37. "The failure of an agency to make a final disposition of a claim within six months

after it is filed shall, at the option of the claimant anytime thereafter, be deemed a final denial of the claim." 28 U.S.C. § 2675(a).

38. Here, the original offer was filed in 2018 and was re-filed in September of 2019. Collection action continued throughout the pendency of these various Offers-in-Compromise. This lawsuit was filed in December of 2020, more than six (6) months after the violations of the IRM I.R.C. § 6331(k)(1)(A)-(B) Suspension of Levy, and more than six (6) months after the Form 95 Claims were filed on September 13, 2019 and June 20, 2020.

**Count II – Intentional Infliction of Emotional Distress and/or Negligent Infliction of Emotional Distress Under the Federal Tort Claims Act**

39. Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1-38 above.

40. A taxpayer who is injured by actions of the United States Government, stemming from agency action by the IRS, including but not limited to "abusive tax collection" can recover for their injuries in tort, subject to the limitations in the Federal Tort Claims Act.

41. 26 U.S.C. § 2680(c) statutorily exempts "any claim arising in respect of the assessment or collection of any tax." The exemption is not without limits and does not cover actions by an IRS agent that have "no realistic nexus to the function of assessing or collecting taxes," but which are nonetheless undertaken "sufficiently within the scope of [the agent's] employment to give rise to a [tort] action against the United States."

42. In Johnson v. Sawyer, 980 F. 2d 1490 (5th Cir. 1981) the Fifth Circuit upheld a nearly $11,000,000 District Court verdict against the United States Government which determined that the IRS violated 26 U.S.C. § 6103 and committed Intentional Infliction of Emotional Distress by disclosing confidential information about a plea agreement for a criminal federal tax investigation which caused direct and consequential damages to Plaintiff Johnson in the amount of $5,902,117 for

the loss of the taxpayer's C-Suite Executive Position (calculated as $3,675,917 of lost earnings plus $1,1542,492 of lost pension, plus $664,208 of lost deferred compensation) together with $5,000,000 of emotional distress damages. Id. at 1492-1496.  Critical to the 5th Circuit's affirmation of the trial verdict on appeal was that the criminal proceedings were held privately by agreement of the government and defense counsel and the plea agreement specifically required that the reading of the criminal information, arraignment and sentencing be conducted simultaneously in a closed court room on a Friday afternoon and that no press release would be published or released and that Johnson's name and address would be altered in the official record, and that all of this was agreed to by the Government in light of the fact Johnson had kept his employer, American National, and its Board apprised of the issue and would be able to keep his employment so long as no "public scandal" arose out of the resolution of the tax investigation. Id. at 1493.  Nonetheless a press release was issued by AUSA Powers that is excerpted at 1493, fn 7 and read:

> "INSURANCE EXECUTIVE PLEADS GUILTY IN TAX FRAUD CASE GALVESTON, TEXAS—In U.S. District Court here, April 10, Elvis E. Johnson, 59, plead [six] guilty to a charge of federal tax evasion.  Judge Hugh Gibson sentenced Johnson, of 25 Alder Circle, to a six-month suspended prison term and one-year supervised probation.  Johnson, an executive vice-president for the American National Insurance Corporation, ***was charged in a criminal information with claiming false business deductions and altering documents involving his 1974 and 1975 income tax returns.*** In addition to the sentence, Johnson will be required to pay back taxes, penalties and interest." (Emphasis added).

Id. at 1493.  Plaintiff Johnson lost his job and employment benefits as a result, was embroiled in public scandal, and had his reputation irreparably damaged, resulting in substantial emotional distress. Id.  The Johnson Court considered the exemption for "assessment and collection of tax" under 26 U.S.C. § 2680(c), found it inapplicable, and discussed its contours in detail.  The 5th Circuit stated that "[t]o argue that the actions of the IRS officers involved with the Johnson news release were casually connected to the tasks of assessing or collecting taxes strains credulity to the breaking point." Id. at 1503.  The 5th Circuit described the government actions above as "trophy hunting" [Id.

at 1498] and found that "[no] realistic nexus to the function of assessing or collecting taxes [existed]." *Id*. The 5th Circuit gave a not to the standard in Cappozoli (*Cappozoli v. Tracey*, 663 F. 2d 654 (5th Cir. 1992) and said, "In Cappozzoli [sic] v. United States, we stated that 'an IRS agent could engage in tortious conduct sufficiently removed from the agents official duties of assessing or collection taxes as to be beyond the scope of Section 2680(c), and at the same time sufficiently within the scope of his employment to give rise to an action against the United States.' Today we consider such a situation." *Id.* at 1504.  As in Johnson v. Sawyer, 980 F. 2d 1490 (5th Cir. 1981), the actions taken by the IRS in this case had no nexus to the collection of tax, but were undertaken by agents of the IRS sufficiently within the scope of their employment to give rise to an action against the United States."

43.  Here, the IRS Agents familiar with this matter knew that Plaintiff lacked the ability to pay and was suffering from an economic hardship, and if they referred to the codes in the IRS system, would have readily identified a Suspension of Levy hold.

44.  Nonetheless, whether negligently or recklessly, IRS personnel called and harassed Plaintiff's secretary and other office staff about his unpaid debt, disclosing confidential tax information in violation of 26 U.S.C. § 6103.  Calls were also placed to Plaintiff's bank, to some of his customers, and to legal colleagues.  On information and belief, tax matters were also discussed with Plaintiff's wife Sylwia, who is not liable for or granted Power-of-Attorney to discuss such matters with IRS personnel.  In addition, IRS notices were sent to incorrect addresses, further leading to potential unauthorized disclosure.  Aside from embarrassment and humiliation, these actions by the IRS caused real damage.  Plaintiff had office staff deeply concerned about their jobs, had customers asking questions, and had to change his banking relationships a number of times.

45.  This extreme and outrageous conduct by IRS Agents had "no realistic nexus to the function of assessing or collecting taxes," but which are nonetheless undertaken "sufficiently within the scope of [the agent's] employment to give rise to a [tort] action against the United States."

46. As discussed in Count I, the taxpayer exhausted all of his administrative remedies and waited the requisite six (6) months when no agency action was forthcoming before filing this lawsuit.

**Count III – Unauthorized Disclosure of Taxpayer Information Under 26 U.S.C. § 7431**

47. Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1-46 above.

48. As described above, IRS personnel made unauthorized disclosure of confidential taxpayer information in violation of 26 U.S.C. § 7431 and 26 U.S.C. § 6103.  Actual damages under this section are limited to the greater of $1,000 for each act of unauthorized disclosure, or the sum of actual damages sustained as a result of the disclosure and punitive damages in cases of willful or grossly negligent disclosure.

**WHEREFORE**, Plaintiff requests:

1. Actual and/or punitive damages stemming from Defendants' violations of 26 U.S.C. §§ 7433, 7432, 7431, for intentional and/or negligent infliction of emotional distress under the Federal Tort Claims Act ("FTCA"), and for unauthorized disclosure of taxpayer information, all of which stemmed from harassment and other abusive collection practices that had "no realistic nexus to the function of assessing or collecting taxes," but which are nonetheless undertaken "sufficiently within the scope of [the agent's] employment to give rise to a [tort] action against the United States."
2. Such other and further relief as the Court deems just and proper, including, if appropriate, attorneys' fees and costs for this action.

Dated: New York, NY
       March 17, 2021

Respectfully submitted,

/s/ John P. Fazzio, Esq.
JOHN P. FAZZIO ESQ.
305 Broadway, 7th Floor
New York, NY 10007
Phone: (201) 529-8024
Fax: (201) 529-8011
Email: jfazzio@fazziolaw.com
*Attorneys for Plaintiffs*